J-A23012-22
J-A23013-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.J.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: LEGAL COUNSEL FOR MINOR CHILD | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 740 MDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0009a

| | | |
|---|---|---|
| IN THE INTEREST OF: R.M.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: LEGAL COUNSEL OF THE MINOR CHILD | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 741 MDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0010a

BEFORE:   BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED DECEMBER 14, 2023**

---

[*] Former Justice specially assigned to the Superior Court.

El.A., born in August 2019, and R.A., born in June 2018, appeal from the decrees terminating the parental rights of their mother ("Mother") and father ("Father").[1] Upon review, we affirm.

The York County Office of Children, Youth, and Families ("CYF") first became involved with the family in 2019 based upon concerns with substance abuse by Mother and Father. A referral was made to CYF in August 2020 based on an allegation that they were abusing drugs and not properly disciplining or supervising the four oldest children. Those children were placed

_____

[1] The orphans' court also terminated the parents' rights as to three additional siblings: B.W., born in May 2014; Ed.A., III, born in June 2015; and A.A., born in June 2021. We have adjusted the abbreviations used within this writing to align with those used by this Court in several related cases presently or recently before this Court. To wit, with respect to termination, Father and Mother have also appealed, and those appeals are docketed at 683-687 MDA 2022, and 755-759 MDA 2022, respectively. Additionally, Father and Mother also appealed the goal change from reunification to adoption, docketed at 201-205 MDA 2022 and 295-299 MDA 2022, respectively. Finally, Father and Mother appealed from an order finding them both perpetrators of abuse as to B.W. and El.A. This Court stayed all matters, including the instant termination appeal, pending resolution of the abuse appeals. Ultimately, we affirmed the findings of abuse. *See Int. of B.W.*, 2023 WL 5526687 (Pa.Super. 2023) (non-precedential decision) (affirming the finding of abuse as to Father); *Int. of B.W.*, 290 A.3d 702, 2022 WL 17973239 (Pa.Super. 2022) (non-precedential decision) (affirming the finding of abuse as to Mother). Although the stay has been lifted in the termination matters, it remains active on the goal change appeals. Regrettably, the cumulative effect has been the tragic prolongation of several Children's Fast Track cases for this family, which are, by nature, meant to be resolved quickly by this Court for the benefit of the impacted children.

into care and adjudicated dependent on September 16, 2020. After A.A. was born, he was likewise placed into care and adjudicated dependent.[2]

As a result of the dependency adjudications, Mother and Father were ordered to, *inter alia*, cooperate with both announced and unannounced home visits by CYF; complete a mental health evaluation and follow treatment recommendations; actively participate in services; obtain employment and provide proof of income to CYF; maintain safe, clean, and appropriate housing; submit to random drug testing; and continue their drug and alcohol treatment and participation in a methadone program. **See** Family Service Plan, 10/2/20, at 14, 16-18; **see also** Family Service Plan, 3/12/21, at 14 (adding, among other things, that the parents notify CYF of any change in household members and attend medical appointments for the children, and for Father to adhere to the conditions of his probation); Family Service Plan, 8/9/21 (same, issued following A.A.'s birth and adjudication of dependency).

Meanwhile, in the companion dependency matters, allegations of physical abuse were made against Father and Mother in December 2020 and January 2021, as to B.W. and El.A. The report included allegations that the parents slapped the children with an open hand, including when El.A. was less than one month old, and struck the children with a belt. In his forensic interview with the Child Advocacy Center ("CAC"), B.W. indicated that he would take the beatings in order to spare his younger siblings from similar

---

[2] All five children were eventually placed in the same pre-adoptive resource home, where they remained together at the time of the termination hearing.

abuse. *See* Orphans' Court Opinion (El.A.'s appeal), 6/15/22, at 26 (citing

CAC video).

This Court recounted the testimony offered at the March 10, 2022

finding of abuse hearing as follows:

> The CAC forensic interviewer. . . testified: "B.W. disclosed being beat — his words — that El.A. was slapped with a belt," Father beat R.A. and El.A., Mother slapped B.W., and B.W. observed potential drug use. B.W. further reported El.A. suffered injuries, including bleeding from the mouth.
>
> CYF Caseworker [Kristen] Marshall, who observed the interview, testified:
>
>> B.W. disclosed that he and his siblings were being punished with a black belt with little spikes on it. He reported that it was hurtful. B.W. actually stated it hurt more than a gun. He stated the spikes were sharp and caused him to bleed. He stated he would cry and he was hit over and over. The very red marks like — were left like it was bleeding, but it wasn't. And he stated that both parents would hit him.
>
> CYF additionally entered into evidence the forensic interview summary and a DVD video of the forensic interview. Ms. Marshall sought, but did not receive, medical records that might show physical injury to B.W. She also attempted multiple times to schedule an interview with Mother and Father, but was unsuccessful.
>
> With respect to El.A., Ms. Marshall testified that B.W. stated Mother and Father sometimes slapped El.A., so there was blood under his tongue, and that El.A. would cry a lot and neighbors would hear. As stated above, B.W.'s statements led to a referral as to El.A. An investigation revealed El.A. was taken to the York Hospital emergency room for bleeding from the mouth in August 2019 when he was less than a month old.

***Int. of B.W.***, 290 A.3d 702, 2022 WL 17973239, at \*2-3 (Pa.Super. 2022) (non-precedential decision) (cleaned up). Following a prolonged investigation, partially due to the parents' refusal to submit to police interviews, the court found both Mother and Father to be perpetrators of abuse against B.W. and El.A. As noted, this Court affirmed those findings.

On January 19, 2022, CYF filed petitions to terminate the parental rights of Mother and Father as to all five children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (5). As to the four oldest children, B.W., Ed.A., R.A., and El.A., CYF also sought termination pursuant to § 2511(a)(8).

The court held hearings on the petitions on April 1 and 18, 2022.[3] CYF presented the testimony of caseworker Kristen Marshall, the family advocate and family therapist from Pressley Ridge, and Mother's methadone counselor at Pyramid Healthcare and recovery specialist at RASE Project, and Father's methadone counselor and probation officer. Through their testimony, it was relayed that the parents had been consistent with their visits with the children and had made significant progress resolving their substance abuse. However, as of the first day of the hearing, CYF remained concerned because they had not alleviated the environmental concerns at the house, made progress in their mental health treatment, or established financial stability. Additionally,

---

[3] At the termination hearing, each child had their own attorney representing their respective legal interests. David Worley, Esquire, collectively represented the best interests of all five children as their guardian *ad litem* ("GAL").

- 5 -

visits had not progressed beyond supervised, and both parents recently tested positive for alcohol, which concerned CYF for multiple reasons.

At the second hearing, over two weeks later, Father and Mother testified. During the gap between hearings, Mother re-initiated mental health treatment and Father had an appointment for the following day. Also in the interim, the family therapist visited the home on a scheduled visit. Mother attempted to demonstrate that the house had since been made appropriate for reunification through her own testimony and by recalling the family therapist. The parents also explained their work histories, the utility payments at the house, and attendance at medical appointments for the children. Finally, Father, presented testimony from another CYF caseworker regarding Ms. Marshall's alleged bias.

The children's GAL argued that termination was in the best interests of each child. Specifically, the GAL was concerned that the physical abuse had been unaddressed and was wary of the last-minute efforts by the parents to finally re-initiate mental health treatment and attempt to make the home environment appropriate. Through legal counsel, two-year-old El.A. expressed that despite the finding of abuse, he had a strong bond with his parents and would oppose termination. Likewise, legal counsel for three-year-old R.A. relayed that she also had a strong bond with her parents and would oppose termination. Notably, there was no indication by legal counsel or any other witness that either child had articulated a specific desire to remain with Mother and Father.

At the conclusion of the hearing, adopting the GAL's concerns, the orphans' court terminated the parental rights of Mother and father as to all five children, and issued separate orders changing each child's permanency goal to adoption. El.A. and R.A. timely filed notices of appeal and concise statements pursuant to Pa.R.A.P. 1925(a)(2). The orphans' court complied with Rule 1925(a).

El.A. presents the following issues for our consideration:

1. Whether the [orphans'] court erred as a matter of law and/or abused its discretion in entering its judgment and/or the [orphans'] court's judgment was manifestly unreasonable?

2. Whether pursuant to [§] 2511(a)(1), insufficient evidence was presented to show that the parents, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, either evidenced a settled purpose of relinquishing parental claim to the child or had refused or failed to perform parental duties?

3. Whether pursuant to [§] 2511(a)(2), insufficient evidence was presented to show that the parents exhibited a repeated and continued incapacity, abuse, [neglect] or refusal by either parent which had caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and that any such alleged conditions and causes of incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent?

4. Whether pursuant to [§] 2511(a)(5), insufficient evidence was presented to show that the conditions for removal continue to exist and that the parents, either individually or collectively, cannot or will not remedy those conditions in a reasonable period of time and that termination serves the needs and welfare of the child?

5. Whether pursuant to [§] 2511(a)(8), insufficient evidence was presented to show that the conditions that led to the removal

- 7 -

continue to exist and that termination best serves the needs and welfare of the child?

6. Whether pursuant to [§] 2511(b), insufficient evidence was presented that termination served the developmental, physical and emotional needs and welfare of the child?

El.A.'s brief at 4-5 (cleaned up).[4]

With respect to R.A.'s appeal, this Court is presented with a single question, namely, whether the orphans' "court abused its discretion and erred as a matter of law and/or exercised manifestly unreasonable judgment in terminating the parental rights of [R.A.'s] mother and father when insufficient evidence was presented to satisfy [the] burden of proof?" R.A.'s brief at 7.[5] In sum, both children ask this Court to review the orphans' court's discretion in terminating their parents' parental rights involuntarily.

We begin with the relevant legal principles governing such review:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only

---

[4] El.A. listed and withdrew three additional issues. CYF and the GAL filed a single, collective brief in support of affirming the orphans' court's decrees.

[5] The GAL and CYF filed a single, collective brief in support of affirming the orphans' court's decrees.

upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up).

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

> parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).  We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b).  *T.B.B.*, *supra* at 395.  The children assert that CYF failed to establish by clear and convincing evidence the statutory grounds for termination of parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  To affirm the termination of parental rights, this Court need only agree with the orphans' court as to any one subsection of § 2511(a), as well as § 2511(b).  *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).  We focus our analysis for both children and both parents on § 2511(a)(5) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance

reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

First, we address whether the orphans' court abused its discretion by terminating the parental rights of Mother and Father as to El.A. and R.A. pursuant to § 2511(a)(5). Termination under this subsection requires that the moving party prove the following elements:

(1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.

*In re B.C.*, 36 A.3d 601, 607 (Pa.Super. 2012) (citation omitted).

El.A. argues that there was insufficient evidence that the conditions leading to his removal remained at the time of the termination hearing

- 11 -

because his parents had successfully addressed their substance abuse issues. *See* El.A.'s brief at 29-30. He characterizes CYF's environmental concerns as "minor" and contends that they had been addressed. *Id*. at 30. Finally, El.A. assails the evidence that termination would be in his best interests. *Id*.

R.A., for her part, also focuses on the parents' compliance with drug treatment as demonstrating that the substance abuse issues leading to placement had been resolved and argues that any concerns about Father's anger towards the service providers had been resolved. *See* R.A.'s brief at 34, 38. Additionally, she posits that the court erred in relying on Father's disorderly conduct conviction without knowing the date of the underlying conduct, and in relying on CYF's concerns related to environmental issues and financial documentation. *Id*. at 38-39. According to R.A., the parents submitted documentation to their service team and, after noting the contentious relationship between the parents and Ms. Marshall, R.A. questions the general stewardship of the case towards reunification under Ms. Marshall. *Id*. at 43-46. To that end, she challenges the orphans' court's statement during the hearing discounting statements that Ms. Marshall may have said out of frustration regarding the underlying matter. *Id*. at 48. R.A. alleges that her parents had addressed all concerns and demonstrated their ability to properly supervise the children. *Id*. at 46-47. In sum, she avers that the orphans' court placed greater weight on negative events occurring more than a year before the filing of the termination petition and inadequate weight on the positive and recent progress of parents. *Id*. at 47.

While El.A. and R.A. focus on testimony supporting the conclusion that the environmental concerns had been remedied by the parents and financial documents provided to the service team, it was wholly within the province of the orphans' court to make credibility determinations regarding the testimony offered and reach the opposite conclusion. As to the court's decision to credit Ms. Marshall's testimony, it noted that "[w]hether she said some untoward things out of frustration does not necessarily impact credibility." N.T. Hearing, 4/1/23, at 169. We discern no error in this conclusion. The court was merely expressing its understanding that these cases were difficult and that those who work in stressful fields sometimes say things, outside the presence of the court or the parties involved, that they would not otherwise state. However, so doing does not necessarily impugn their character or discredit their testimony. Rather, the court waited until hearing Ms. Marshall's testimony, in light of the conflicting testimony from the Pressley Ridge workers, to ascertain her credibility. Ultimately, the court found Ms. Marshall credible.

In finding Ms. Marshall credible, the court also rejected the argument that she had stymied progress through her stewardship of the case and lack of diligence in the abuse investigation. As noted by Ms. Marshall, the visits were not expanded to partially supervised because of the open abuse investigation, the condition of the house remained inappropriate, the parents' difficulties in setting boundaries during visits, and generally insufficient progress with their parenting goals. *See* N.T. Hearing, 4/18/22, at 68-69.

Her testimony was supported by that of the Pressley Ridge witnesses. The family advocate, Michele Mahoney, testified that the original concern necessitating supervised visits was the parenting capacity of Mother and Father. *See* N.T. Hearing, 4/1/22, at 56. The parents demonstrated an improved ability to control visits after therapy started in September 2021, and at the time of the termination hearing, she indicated that she would now be amenable to partially-supervised visits. *Id*. at 56.

Likewise, the family therapist, Jessica Myers, testified that a second supervisor was added to the visits because there were concerns with the parents whispering to the children, as well as for someone to monitor B.W.'s mental health during visits. *Id*. at 77-78. The whisperings and potentially manipulative conversations were one of the reasons that visits had not progressed to partially supervised. *Id*. at 109. Nonetheless, she testified that, at the time of the termination hearing, she would support partially-supervised visitation. *Id*. at 107.

Even if the open investigation had been the only reason preventing visits progressing to partially supervised, that was not the sole fault of Ms. Marshall. She explained the procedure regarding open abuse investigations, and that the police must initially conduct interviews in order to move the investigation along. Father and Mother refused to participate in those interviews. Once Ms. Marshall was directed by the court in November 2021 to proceed without the benefit of those interviews, she completed the abuse investigation by

January 11, 2022. *See* N.T. Hearing, 4/18/22, at 63-64; *B.W.*, *supra* at *2. While the delay in the investigation was certainly unwanted, it cannot be attributed solely to Ms. Marshall, particularly as it was the refusal by the parents to participate in the initial police interview that stalled the investigation. Moreover, once Ms. Marshall conducted the investigation, it appears to have been completed with expediency.

As the court's credibility determinations are supported by the record, they should remain undisturbed. *See M.G.*, *supra* at 73-74; *T.B.B.*, *supra* at 394. Accepting these credibility determinations, our review of the certified record indicates that the court found that CYF had met its burden as to termination based upon the parents' failure to demonstrate the ability to provide safe and stable care for the children. This was evidenced by the housing concerns, failure to take seriously the mental health treatment, and lack of evidence of a stable income to support five children.

Ms. Marshall, who had been assigned to the case since October 2020, testified that Mother's primary concerns at adjudication were substance abuse, environmental issues in the home, mental health, and drug testing. *See* N.T. Hearing, 4/1/22, at 197. With regard to the environmental issues, as noted hereinabove, the parents' goals included complying with unannounced and announced home visits by CYF, maintaining safe appropriate housing, and performing routine housekeeping.

During Ms. Marshall's tenure, she attempted to make eight home visits. In November 2020, there were lice issues, the heavy smell of animal feces and urine smell, and problems with the toilet, stairwell railing, and one of the bedroom floors. At the next two visits, both in December 2020, the toilet and railing issues had been repaired. In January 2021, she was unable to enter the house due to COVID-19 concerns and lice. In July 2021, a proxy visited the house but was not permitted inside. Nonetheless, the proxy noted that it smelled like garbage outside and the front porch was messy. In August 2021, Ms. Marshall was denied entry into the house but noted a strong smell of animal feces when the door was opened. Again, in January 2022, she was not allowed into the house to conduct a home visit. Her last visit was conducted on March 24, 2022. *See* N.T. Hearing, 4/18/22, at 46-47.

During the last visit, which was unannounced, Mother was away from the home, but returned when called and was inside for a few minutes before admitting Ms. Marshall and her supervisor into the home. There was a potent smell of animal feces and urine, feces in the kitchen trash, a dog peeing sporadically in the house, space heaters throughout the home, including one on top of a laundry basket filled with clothes, no sink in the only bathroom, concerns with water damage in the parents' bedroom, and animal feces in one of the children's rooms. *See* N.T. Hearing, 4/1/22, at 200-203.

Turning to the elements of § 2511(a)(5), neither child contests that they were removed from their parents' care for a period exceeding six months.

Therefore, the first element is satisfied. As to the second, third, and fourth elements, the initial placement was based upon concerns about the parents' drug use, inappropriate parenting, unstable employment, unsafe housing, and the need for mental health treatment. Once there were allegations and findings of abuse, that naturally became part of the concerns as to their parenting and ability to provide a safe home environment. While the parents made great strides with regard to their drug abuse, the orphans' court concluded that they could not remedy the remaining conditions leading to adjudication within a reasonable amount of time. *See e.g.*, Orphans' Court Opinion (El.A.'s appeal), 6/15/22, at 29. Specifically, the court held as follows:

> As the record shows, the children were removed from Father and Mother for more than parents' drug use or Father's overdose. CYF received a referral several days prior to Father's overdose. CYF had prior history with the family and feared Mother would revoke the safety plan implemented for the children's welfare. From the outset, the revised safety plan, dated October 2, 2020, provided objectives that are not beyond the control of the parents related to cooperating with agency services, gaining employment and financial stability, providing proof of income, securing appropriate housing and sleeping quarters for the children, routine housekeeping, and methadone treatment, etc.

> Furthermore, the allegations of physical abuse by B.W. and the finding of abuse raise safety concerns regarding the children. The parents' consistent denials that anything happened regarding the finding of abuse is concerning. During the period that the children have been outside of the home, a report to the court for a permanency review hearing indicated that Father often escalates to yelling and cursing during team conversations[.] On August 31, 2021, the Catholic Services Intensive Family Services Team closed out services and recommended anger management because Father was inappropriate. In September 2021, Mother reported

that an argument escalated to the point that her mother threatened to file a protection from abuse order against her. Father pleaded *nolo contendere* to disorderly conduct for fighting for 12 months [of] probation. The court is not aware of the date of the specific disorderly conduct. However, these other instances occurred after or while Mother and Father were receiving various services and raise concerns regarding the safety of the children.

The children . . . have been removed for almost twenty months at this time. Parents certainly made progress with regard to the methadone program as required by the family service plan cited. The parents could not remedy the remaining conditions within a reasonable time. Given that parents have had some services close unsuccessfully or declined, it is not likely that available services will remedy the remaining conditions that led to the removal or placement of the children within a reasonable period of time. . . . [T]he court believed termination serves the best interests of the children who require permanency.

There was testimony that the children enjoy their visits with the parents and are bonded to them. Despite this, the court believes termination is in the children's best interests. The safety and well-being of the children is of paramount concern to the court. The children are all together in a safe environment with [the foster mother], whom they call "mom-mom," and they are receiving therapy. The children have exhibited troubling behaviors, which suggests trauma.

*Id*. at 27-29 (cleaned up). With respect to the children who are appealing the termination decrees, R.A. has been sexually acting out. *Id*. at 29-30.

While we agree that the parents should certainly be commended for their successful drug treatment and sobriety, the children were not removed solely on the basis of substance abuse. The parents have failed to make sufficient progress towards the remaining goals, namely, engaging with mental health treatment to address, *inter alia*, the physical abuse; correcting

- 18 -

the environmental concerns in the home; and demonstrating financial stability.

> [T]he statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Therefore, we conclude that the orphans' court did not abuse its discretion in finding statutory support for termination pursuant to § 2511(a)(5) as to El.A. and R.A.

> Turning to § 2511(b), we again set forth the guiding principles.

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Int. of K.T.*, 296 A.3d 1085, 1105–06 (Pa. 2023) (cleaned up).

- 19 -

This Court has emphasized that "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." ***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***In re T.S.M.***, 71 A.3d 251, 269 (Pa. 2013). "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id***. A court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." ***In re C.L.G.***, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

The certified record supports the orphans' court's conclusion that termination was in the best interests of El.A. and R.A. with respect to both parents. Notably, the GAL advocated in favor of termination as being in their best interests. ***See*** Appellees' brief (El.A.'s appeal) at 27 (arguing that termination of parental rights is in the best interests of El.A.); Appellees' brief (R.A.'s appeal) at 27 (same as to R.A.). The court acknowledged the bond between the two children and the parents, and that both Mother and Father have made progress towards some of their goals. However, the court held that it "cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." Orphans' Court Opinion (El.A.'s appeal), 6/15/22, at 35 (quoting

*R.J.S.*, *supra* at 513). Ms. Marshall testified that based upon her observations of the children in the resource home, El.A. and R.A. have a family relationship with the foster mother and are safe in the resource home. N.T. Hearing, 4/1/22, at 217-18.

As El.A. and R.A. are together with their siblings, safe, and bonded with their foster mother, the court concluded that it was in their best interests to terminate the parental rights of Mother and Father so that the children could achieve permanency. *Id*. at 35-36. As detailed hereinabove, the facts as found by the orphans' court are supported by clear and convincing evidence, and its conclusions are free from legal error. In our review, its conclusions are not manifestly unreasonable, or the subject of partiality, prejudice, bias, or ill-will, so as to support a reversal of the decrees terminating involuntarily the parents' parental rights as to El.A. and R.A. *See C.M.*, *supra* at 359. In light of our deferential standard of review, we find no abuse of discretion, and affirm the decrees terminating the parental rights of Mother and Father as to El.A. and R.A.

Decrees affirmed.

P.J.E. Stevens joins this Memorandum.

Judge McCaffery files a Dissenting Statement.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/14/2023